# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **DORNNEL LOCKE, JOSE NIEVES,** | : | **CIVIL ACTION NO:** |
| **ELVIN GONZALEZ, JAMAL WEBBER, and** | : | |
| **DIENUS LESPORIS,** | : | **3:23-cv-1237 (      )** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **WAYNE J. GRIFFIN ELECTRIC, INC.;** | : | |
| **RC ANDERSEN, LLC; and AMAZON.COM,** | : | |
| **INC. d/b/a AMAZON,** | : | |
| | : | |
| **Defendants.** | : | **September 21, 2023** |

# COMPLAINT

## COUNSEL FOR PLAINTIFFS

Stephen J. Fitzgerald *(ct22939)*
Joshua R. Goodbaum *(ct28834)*
Betsy A. Ingraham *(ct27820)*
**GARRISON, LEVIN-EPSTEIN**
      **FITZGERALD & PIRROTTI, P.C.**
405 Orange Street
New Haven, CT  06511
Tel.: (203) 777-4425
Fax: (203) 776-3965
sfitzgerald@garrisonlaw.com
jgoodbaum@garrisonlaw.com
bingraham@garrisonlaw.com

# TABLE OF CONTENTS

Page

Introduction ……………………………………………………………………   1

I.      PARTIES …………………………………………………………...   2

II.     JURISDICTION AND VENUE …………………………………………   3

III.    EXHAUSTION OF REMEDIES ………………………………………..   4

IV.     FACTUAL ALLEGATIONS ……………………………………………   5

       A.  Defendants Are Aware of the Threat of Nooses in Their
           Workplaces After Plaintiff Locke Encounters a Noose at an
           Amazon Construction Site in 2017 …………………………………………   5

       B.  The Electricians at the Windsor Site in 2021 Are
           Disproportionately Men of Color …………………………………………   7

       C.  Plaintiff Elvin Gonzalez Finds a Hanging Noose on the Jobsite
           and Immediately Informs Management …………………………………..   8

       D.  Defendants' Response to the First Two Nooses Is Non-Existent
           and Ineffective …………………………………………………………   9

       E.  Many More Nooses Are Discovered ……………………………………   10

       F.  The FBI Sets Its Sights on Plaintiffs After Meeting with
           Griffin and RC Andersen Managers ……………………………………   12

       G.  Griffin Becomes an Increasingly Hostile Place for Plaintiffs to Work ……   13

V.      LEGAL CLAIMS ………………………………………………………..   15

<u>Introduction</u>

1.     The hangman's noose is widely known to be a symbol of violence and hatred directed towards Black and Brown men.  Because the noose was historically used as a tool to kill men of color, it is now used to communicate an intimidating threat of violence.  The appearance of a noose, even one noose, in a workplace sends a clear message of hostility towards the men of color working there: "You are not welcome here, and you better watch your back."

2.     Before April 2021, Defendants Amazon.com, Inc., Wayne J. Griffin Electric, Inc., and RC Andersen, LLC, were on notice that the Amazon distribution centers which they collectively owned, managed, controlled, and/or serviced were subject to the hanging of hateful nooses.  In particular, in 2017, electricians working for Wayne J. Griffin Electric, Inc. complained to management after they found a noose on their jobsite.

3.     Likewise, before April 2021, Defendants were aware that the electrician workforce supplied to these sites by Wayne J. Griffin Electric, Inc. were largely comprised of men of color who would be particularly threatened by the hanging of nooses in their workplaces.

4.     Nonetheless, before April 2021 – including after the reporting of the 2017 noose – Defendants failed to take appropriate remedial actions to prevent the hanging of nooses in their workplaces.

5.     In April and May 2021, Plaintiffs Dornnel Locke, Jose Nieves, Elvin Gonzalez, Jamal Webber, and Dienus Lesporis were working at the construction site that would become the Amazon distribution facility in Windsor, Connecticut.  While working at that location in the spring of 2021, they and others found numerous nooses in their work area.  Plaintiffs are all Black and Brown.  Accordingly, they were understandably disturbed to have their workplace infected with these hateful and threatening symbols.  As noose after noose was found at this Amazon site,

Plaintiffs rightly complained about Defendants' failure to remove the hostility from their work environment.

6.     Following their complaints about the racial hostility at their workplace, Plaintiffs endured retaliation.  Law enforcement officials accused them of hanging the nooses after those officials met with Defendants' managers.  Plaintiffs became the subject of insulting, derogatory, and accusatory comments from Wayne J. Griffin Electric, Inc.'s managers.  And after Plaintiffs complained about Wayne J. Griffin Electric, Inc.'s inadequate response to the nooses, their work assignments deteriorated.

7.     Wayne J. Griffin Electric, Inc.'s acts and omissions give rise to claims of hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., and the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. §46a-60(b)(1) & (4), as well as a claim under 42 U.S.C. §1981, which was originally enacted as part of the Civil Rights Act of 1866 to protect the civil rights of persons of African descent born in or brought to the United States.

8.     The acts and omissions of RC Andersen, LLC and Amazon.com, Inc. give rise to claims against them under 42 U.S.C. §1981.

9.     Plaintiffs demand a jury on all claims so triable.

I.     **PARTIES**

10.     The plaintiff, Dornnel Locke, is an African-American male.  He is a citizen of Connecticut.

11.     The plaintiff, Jose Nieves, is a Puerto Rican-American male.  He is a citizen of Connecticut.

12.     The plaintiff, Elvin Gonzales, is a Puerto Rican-American male.  He is a citizen of Connecticut.

13.     The plaintiff, Jamal Webber, is an African-American male.  He is a citizen of Connecticut.

14.     The plaintiff, Dienus Lesporis, is an African-American male.  He is a citizen of Connecticut.

15.     The defendant, Wayne J. Griffin Electric, Inc. ("Griffin"), is a major electrical contractor that is incorporated in Massachusetts and has its corporate headquarters in Holliston, Massachusetts.

16.     The defendant, RC Andersen, LLC ("RC Andersen"), is a construction manager that is incorporated in New Jersey and has its corporate headquarters in Fairfield, New Jersey.

17.     The defendant, Amazon.com, Inc., d/b/a Amazon ("Amazon"), is a multinational technology company focused on e-commerce that is incorporated in Delaware and has its corporate headquarters in Seattle, Washington.

18.     Griffin, RC Andersen, and Amazon (collectively, "Defendants") each employ 15 or more employees.

19.     During the events described herein, Plaintiffs were employed by Griffin for purposes of 42 U.S.C. §2000e et seq. and Conn. Gen. Stat. §46a-60(b)(1) & (4).

## II.     <u>JURISDICTION AND VENUE</u>

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because Plaintiffs are citizens of Connecticut, Defendants are citizens of one or more states other than Connecticut, and the matter in controversy exceeds $75,000.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred herein.

3

### III.    **EXHAUSTION OF REMEDIES**

22.    On or about October 21, 2021, Plaintiffs Locke, Nieves, Gonzalez, and Webber filed dual complaints against Griffin with the Connecticut Commission on Human Rights and Opportunities (CHRO) and the Equal Employment Opportunity Commission (EEOC). These complaints (CHRO Nos. 2210161 through 64 and EEOC Nos. 16A-2022-00139 through 00142) described the hanging of nooses in the Amazon facilities and pleaded the existence of a hostile work environment based on race in violation of Title VII, the CFEPA, and the Civil Rights Act of 1866 (as amended by the Civil Rights Act of 1991). On July 25, 2022, Plaintiffs amended these complaints with additional facts describing a pattern and practice of race discrimination by which Griffin denied Black and Brown employees opportunities to work higher paying jobs while assigning White employees to those more lucrative jobs.

23.    The above-mentioned CHRO and EEOC complaints were filed in a timely manner insofar as they were filed within 180 days of Griffin's last discriminatory acts against Plaintiffs Locke, Nieves, Gonzalez, and Webber.

24.    Plaintiffs Locke, Nieves, Gonzalez, and Webber received Releases of Jurisdiction from the CHRO, dated January 12, 2023. Thereafter, the parties entered into a Tolling Agreement.

25.    Taking into account the Tolling Agreement, Plaintiffs Locke, Nieves, Gonzalez, and Webber filed this Complaint within 90 days of the receipt of the Releases of Jurisdiction from the CHRO.

## IV.   FACTUAL ALLEGATIONS

### A.   Defendants Are Aware of the Threat of Nooses in Their Workplaces After Plaintiff Locke Encounters a Noose at an Amazon Construction Site in 2017.

26.   As early as August 2017, Griffin, RC Andersen, and Amazon were on notice that the job sites they owned, controlled, or serviced were susceptible to the hanging of hateful nooses in locations known to be occupied by workers of color.

27.   Defendants regularly partnered in the building and outfitting of massive distribution centers in New England: Amazon owned the building sites; RC Andersen managed the construction as general contractor; and Griffin supplied electricians to wire and power the new buildings.

28.   Although Plaintiffs were employed by Griffin and assigned by Griffin to a particular work location, RC Andersen and Amazon, along with Griffin, controlled the environment in which Plaintiffs were required to work.

29.   In the summer of 2017, Griffin electricians were working at an Amazon distribution center in Bloomfield, Connecticut.  This particular Amazon location was already up and running – a functioning distribution center operated by Amazon personnel.  RC Andersen was managing a construction project at the site.  Griffin supplied electricians, including Plaintiff Locke.  Also working at the Bloomfield site was a conveyor belt subcontractor (Dematic), whose workforce was from different states throughout the southern United States.

30.   On August 14, 2017, several Griffin electricians came to work at the Bloomfield site to discover a noose had been hung inside the building at an area where the electricians would be working.

31.   Plaintiff Locke and other Griffin electricians were startled and upset to see the noose, and they promptly reported it to Griffin's on-site foreman, Jason Lathrop.

5

32.     The response from Defendants was disappointing.   Neither RC Andersen nor Amazon did anything to address the concerns of the Black and Brown electricians who were upset by the noose.   Griffin manager Lathrop claimed that he informed Griffin HR director Donna David about the noose, but in fact he did not.   After Ms. David learned of the noose from the electricians themselves, she organized a site meeting for the next day.   During the meeting, the electricians asked the Griffin managers if the police had been called.   Ms. David responded, in substance, "Without photos, there isn't much we can do.   It's just word of mouth."   Mr. Locke then asked the gathering of frustrated electricians to raise their hands if they had seen the noose; about 18 of them raised their hands.   Despite the abundant witnesses, though, Griffin did nothing more than distribute – more than one month later – a self-serving memorandum which declared, in substance: (1) Griffin doesn't know who hung the noose; (2) Griffin told Amazon and RC Andersen that it does not tolerate discrimination; and (3) "most of you" are "comfortable with the steps [we] took to address the situation."

33.     In contrast to the tepid response from Griffin's managers, the Dematic foreman had a much more direct and effective approach.   This foreman called an immediate meeting of all the workers on the site the morning the noose was found.   He held up the noose – which was made from electrical wire used by his team – and he angrily said, "If I find out who's using my wire to make things like this, I will personally fuck you up myself!"

34.     Upon information and belief, Defendants made no efforts after the events in Bloomfield to ensure that this was the last noose on a job site staffed by Griffin electricians, managed by RC Andersen, and owned/controlled by Amazon.

**B.** **The Electricians at the Windsor Site in 2021 Are Disproportionately Men of Color.**

35.    In April 2021, Plaintiffs were assigned to work at the new Amazon distribution center being built in Windsor.  As usual, at the Windsor site Griffin electricians were the second trade to enter the building after the ironworkers, who raised the steel frame and installed corrugated flooring.  (Amazon and RC Andersen utilized a Texas-based iron subcontractor that employed a workforce known for displaying bumper stickers and helmet decals that featured the Confederate flag.)  After the ironworkers installed the floor, RC Andersen directed the Griffin electricians to enter the structure to hang lights.  The electricians followed the ironworkers from floor to floor – as the floors were constructed – such that the two trades were working simultaneously on the project.  At the time, there were about 50 Griffin electricians assigned to the Windsor site.

36.    As usual for these Amazon projects, the vast majority of the approximately 50 Griffin electricians on the Windsor site, including all Plaintiffs, were men of color.  All Plaintiffs were assigned to the Windsor site.

37.    The assignment of the electricians to different jobs was the purview of Griffin's all-White management team.  The most coveted assignments were publicly-funded jobs or so-called "rate jobs," which paid a higher (prevailing) hourly rate.  The least coveted assignments were the lower-paying private sector projects or so-called "private jobs."

38.    For all Plaintiffs, the experience of job assignments at Griffin was the same: Black and Brown electricians were never or rarely assigned to rate jobs.  If they did work a rate job, it was only for a short time, and they could not help but notice that nearly all of the Griffin electricians assigned to those rate jobs were White.  Instead, Plaintiffs were regularly assigned to private jobs, which were staffed primarily with Griffin electricians who were Black or Brown.

7

39.     In April 2021, Plaintiffs found at the Amazon Windsor site – a private rate job that paid less than the publicly-financed prevailing rate jobs – a Griffin workforce that was primarily Black and Brown.  The ironworkers from Texas were on site and displaying their Confederate flags.  Amazon already had a presence on the site; it had set up and was manning its centralized technology hub, which was called "Denmark."  RC Andersen was managing the construction.  As usual, the plan required the electricians to follow the iron workers – installing lights in the areas recently fitted with flooring.

C.     **Plaintiff Elvin Gonzalez Finds a Hanging Noose on the Jobsite and Immediately Informs Management.**

40.     On April 27, 2021, Plaintiff Elvin Gonzalez returned to his work area after a lunch break to find a noose hanging from the ceiling.  The noose – which was not present when he left for lunch – appeared to be professionally tied, with multiple coils, and there was no possible work reason for its presence.  (David Veto – an apprentice working with Mr. Gonzalez – was also present when the noose was first discovered.)  Mr. Gonzalez took a photograph of the noose.

41.     Mr. Gonzalez called Plaintiffs Dornnel Locke and Jamal Webber to report what he had found at their worksite.  Mr. Webber then called Plaintiff Dienus Lesporis to tell him about the noose.  Mr. Lesporis in turn informed Plaintiff Jose Nieves.

42.     Mr. Gonzalez called Griffin foreman Tom Maribito. Griffin foreman Jason Lathrop – the same person who was supervising the Bloomfield site when a noose was found there in 2017 – came up to the work area with RC Andersen's "safety team."  Mr. Gonzalez heard one member of RC Andersen's team say, "Does anyone have a photo?  Because we don't want Windsor news to find out about this."

43.     Mr. Lathrop and RC Andersen's safety team ordered Mr. Gonzalez to take down the noose.  He did so and handed it to them.  RC Andersen's personnel asked Mr. Gonzalez to

8

prepare a report about what he had found, but Mr. Lathrop intervened, saying, in substance, "No. Don't worry about it.  I will make the report.  You go back to work.  You've dealt with enough."

44.     Upon information and belief, RC Andersen's safety team called the Windsor Police. By the time detectives arrived on scene (at about 3:30 p.m.), the safety team had already disposed of the noose – so it could not be collected as evidence.  Mr. Gonzalez, however, retained the photo he took with his cell phone.

45.     On April 24, 2021 – three days before Mr. Gonzalez found the noose – a cement foreman named Sean Crosby found a noose at the Windsor site.  Mr. Crosby told RC Andersen. RC Andersen kept news of this noose quiet, and Plaintiffs did not learn of this noose until months after the discovery of April 27th noose by Plaintiff Gonzalez.

### D.     Defendants' Response to the First Two Nooses Is Non-Existent and Ineffective.

46.     On April 28, 2021, the day after Mr. Gonzalez found a noose in Windsor, Griffin gathered the electricians for a meeting on site.  No other crafts were called to this meeting.  In fact, the electricians noticed that other trades – mostly White workers – continued to work while they met.  To Plaintiffs, Defendants were sending the message that a noose in the workplace was only a concern for the Black and Brown electricians and not their White coworkers.

47.     Griffin foreman Tom Maribito stood before the electricians and read a prepared statement from RC Andersen.  The statement – which made no mention of nooses and instead merely recited company policy against discrimination on the basis of age, gender, sexual orientation, etc. – struck the electricians as tone deaf.

48.     The electricians asked to hear from the Griffin project manager, Kevin Riendeau, who was noticeably absent.  (Mr. Riendeau had a reputation for disciplining employees of color more often and more harshly than their White coworkers.)  Mr. Riendeau was summoned and

addressed the crowd.  While he started out by saying that the hanging of a noose was "atrocious," he added little reassurance to the pleas from the assembled workers that they did not feel safe.  (If someone had the audacity to hang a noose, after all, what else might they do?)  Mr. Riendeau then called Griffin HR director Donna David on his cellphone and – in front of the group – awkwardly asked her questions over his speakerphone.  When Mr. Riendeau finished talking, the non-White electricians remained dissatisfied with Griffin's response, and they collectively left the site for the day.

49.     In the following days, although there had now been three nooses (including Bloomfield) at Defendants' worksites, Defendants failed to institute any changes which might have prevented the hanging of further nooses.  The Windsor jobsite was never actively patrolled by any significant security presence – police or otherwise.  Yet, Plaintiffs were required to continue working in the environment.

### E.     Many More Nooses Are Discovered.

50.     The following morning (April 29), Ms. David came to the job site to read a letter from Griffin's owner, Wayne Griffin.  Ms. David used the word "noose" and then awkwardly congratulated herself for saying it out loud – although she also denied that one of the nooses was a noose, contending instead that it was merely a "left over tag line."  She asserted that Griffin was working on the issue but that it could do nothing more than offer a reward for information.  She also repeated the claim that RC Andersen was hiring police monitors.  She announced that "flyers will go up"; described  "reward" from RC Andersen; and conceded that "yesterday morning was not sufficient."  (As this meeting took place, work by other teams continued on site.)  At the end of her presentation, Ms. David offered Employee Assistance Program resources, shut down an invitation for a group prayer, and made an inappropriate reference to how many "steps" she was

getting that day.  Throughout the presentation, loud work by other subcontractors on the site continued.

51.     Plaintiffs and their coworkers then entered the building to start work for the day. As they did, five more nooses were found hanging in the areas where they were assigned to work. The nooses were scattered about on different floors in the building where only the ironworkers had been working.  The electricians were (understandably) disgusted, and they decided to "badge out" and go home.  Finally, uniformed Windsor Police officers arrived at the jobsite and began walking around in groups.  At the end of the day, the police found yet another noose.

52.     In the following days, the rash of nooses at the Windsor site became the subject of national news coverage.  A few days later, Griffin managers held a team meeting at which they apologized and gave away "Stand Together" t-shirts.

53.     On May 19, 2021, another noose was found at the Windsor site.

54.     The next day, the jobsite was closed to all construction trades except the Griffin electricians, who were assigned to hang security cameras.  Plaintiffs were initially pleased to be doing this work.  But in short order, they realized the cameras they had hung were never turned on.  And even if they had been, they were all pointed toward doorways and walls, rather than inside the building where future nooses might be hung.  Plaintiffs concluded that the cameras were a farce.

55.     On May 26, 2021, a final noose was discovered at the Windsor site – bringing the Windsor total to eight and the overall total (including Bloomfield) to nine.  Only after this last noose did Amazon finally make the decision to shut down the site for a day because it was a crime scene.

**F.    The FBI Sets Its Sights on Plaintiffs After Meeting with Griffin and RC Andersen Managers.**

56.    In May 2021, FBI Special Agent Ron Offutt was assigned to investigate the Windsor nooses.  Agent Offutt began his investigation by talking with managers from Griffin and RC Andersen.  He then met and interviewed several Plaintiffs – all of whom were willing interviewees because they presumed they would be treated like victims, not suspects.  The aggressive tone and content of those FBI interviews, however, immediately alerted Plaintiffs that Griffin and RC Andersen had identified them as potential culprits in the hanging of the nooses.

57.    Before Plaintiffs were interviewed by the FBI, Griffin announced "productive and cooperative discussions with an FBI representative."  Agent Offutt then began his interviews with Dornnel Locke (at Mr. Locke's house).  Agent Offutt's first contact to Mr. Locke occurred just a few hours after Griffin foreman Jason Lathrop said that he was going to speak with the FBI. During the interview with Mr. Locke, Agent Offutt asked about "prevailing wage jobs" – the telltale terminology used by Griffin managers.  (Plaintiffs and the other electricians, in contrast, call it "rate.")  Agent Offutt suggested that Mr. Locke and other Black and Brown Griffin employees planted the nooses in order to orchestrate re-assignments to higher-paying rate jobs.

58.    Agent Offutt next traveled to a Yale jobsite, where some Plaintiffs had been transferred, to conduct additional interviews.  Agent Offutt started with Griffin manager Ken Johnson, who later told several others at that site that "it could have been one of our guys who hung the nooses so they could be sent to rate jobs."  The manner in which Agent Offutt interviewed Plaintiffs at the Yale site strongly suggests that he accepted the theory articulated by Mr. Johnson. In his interview of Plaintiff Lesporis, for example, Agent Offutt once again asked intimidating questions about "rate" jobs.  Later, during a second interview with Mr. Lesporis, Agent Offutt forcefully told the construction foreman at Yale: "Tell Dienus to come outside.  If not, we will

come and drag him out."  And when Mr. Lesporis did go outside, Agent Offutt aggressively challenged him, screaming: "You were holding the ladder while Jamal [Webber] was up there putting the noose in the rafters."

59.    Agent Offutt then subjected Plaintiffs to polygraph tests and obtained Mr. Lesporis's cell phone, which ultimately did not contain any incriminating information.  (Agent Offutt's application for a warrant for Jamal Webber's cellphone was denied by a Superior Court Judge.)

60.    Plaintiffs were terrified to be in the crosshairs of an FBI investigation.  As men of color from poor and working-class backgrounds, they all had tenuous relationships with law enforcement.  Here, they had vocally complained as witnesses to hateful criminal conduct in their workplace and yet they were now being treated as perpetrators.  They feared arrest and prosecution for a crime they did not commit.  The chilling experience of being wrongly accused added insult to the injury initially caused by the racially hostile environments they endured in Bloomfield and Windsor.

61.    Plaintiffs continue to live in fear of the FBI because its investigation remains open.

**G.    Griffin Becomes an Increasingly Hostile Place for Plaintiffs to Work.**

62.    At their jobsites, meanwhile, Plaintiffs continued to hear – or hear about – comments from Griffin managers that further confirmed their belief that their employer had turned the FBI on them.  For example:

- When Jamal Webber asked Griffin foreman Dave Bushey for a bench where he could sit in a cooling tent on a sweltering summer day, Mr. Bushey responded, "What do you need that for – to hang another noose?!"

- Griffin manager Anthony Swiake told Mr. Lesporis that he believed a Griffin employee hung the nooses at Windsor.

13

▪ Griffin manager Mike LaSalle said in front of witnesses, "I heard it was our guys who hung the nooses so they could go to rate."

63.     As newly-trained Griffin apprentices came to new job sites, they regularly repeated the claim they'd heard in training, in substance: "Our guys hung the nooses so they could get on rate jobs."

64.     By June 2021 – about a week after the eighth noose was found in Windsor – all Plaintiffs had been reassigned to other (mostly private) jobs.  Griffin controlled their assignments, but it did not assign them to the higher-paying jobs, even though those jobs often were closer to their homes.  Instead, after complaining about the nooses and demanding that something be done to stop the hateful conduct in their workplaces, Plaintiffs all found that the quality of their assignments – both rate of pay and location – deteriorated.  It all struck Plaintiffs as retaliation for speaking up.

65.     During their employment with Griffin, Plaintiffs endured an ongoing pattern of harassment because of their race.

66.     The above-described facts evidence Griffin's common plan, scheme, and/or policy to harass and/or discriminate against Plaintiffs because of their race.

67.     As the general contractor and owner of the Windsor distribution facility, RC Andersen and Amazon, respectively, had the ability and responsibility to control Plaintiffs' work environment in a manner that would have prevented the hanging of the hateful nooses. Individually and/or jointly, RC Anderson and Amazon failed to use their resources to provide a secure and safe work environment that was free of nooses.

68.     As Plaintiffs' employer and the electrical sub-contractor at the Windsor distribution facility, Griffin had the ability and responsibility to control Plaintiffs' work environment in a

manner that would have prevented the hanging of the hateful nooses.  Griffin failed to use its resources to provide a secure and safe work environment that was free of nooses.

69.     Meanwhile, the hanging of nooses continued.  In March 2022, at an Amazon construction site in Uxbridge, Massachusetts, yet another noose was found.

## V.      LEGAL CLAIMS

### COUNT ONE:
### HOSTILE WORK ENVIRONMENT ON THE BASIS OF RACE,
### IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-2(a)(1)
### (Plaintiffs Locke, Nieves, Gonzalez, and Webber v. Griffin)

68.     Plaintiffs incorporate by reference all preceding allegations in this Complaint.

69.     Plaintiffs' workplace at the Amazon distribution center in Windsor was permeated with discrimination on the basis of race that was sufficiently severe or pervasive to alter the terms or conditions of their employment and create a hostile working environment.

70.     Griffin's conduct in this regard was willful and/or in reckless disregard to Plaintiffs' right to be free from discrimination.

71.     As a result of Griffin's conduct, Plaintiffs suffered damages.

### COUNT TWO:
### HOSTILE WORK ENVIRONMENT ON THE BASIS OF RACE,
### IN VIOLATION OF THE CFEPA, CONN. GEN. STAT. § 46a-60(b)(1)
### (Plaintiffs Locke, Nieves, Gonzalez, and Webber v. Griffin)

72.     Plaintiffs incorporate by reference all preceding allegations in this Complaint.

73.     Plaintiffs' workplace at the Amazon distribution center in Windsor was permeated with discrimination on the basis of race that was sufficiently severe or pervasive to alter the terms or conditions of their employment and create a hostile working environment.

74.     Griffin's conduct which created the hostile environment was willful and/or in reckless disregard to Plaintiffs' rights to be free from discrimination.

15

75.     As a result of Griffin's conduct, Plaintiffs suffered damages.

## COUNT THREE:
### RETALIATION,
### IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-3(a)
### (Plaintiffs Locke, Nieves, Gonzalez, and Webber v. Griffin)

76.     Plaintiffs incorporate by reference all preceding allegations in this Complaint.

77.     Plaintiffs opposed an unlawful employment practice under Title VII — namely, the creation of a hostile work environment on the basis of race.

78.     Plaintiffs' opposition to discrimination was a motivating factor in Griffin's decision to subject and/or continue to subject Plaintiffs to a hostile work environment or otherwise to disadvantage Plaintiffs.

79.     Plaintiffs' conduct in this regard was willful and/or in reckless disregard to Plaintiffs' right to be free from discrimination.

80.     As a result of Griffin's conduct, Plaintiffs suffered damages.

## COUNT FOUR:
### RETALIATION,
### IN VIOLATION OF THE CFEPA, CONN. GEN. STAT. § 46a-60(b)(4)
### (Plaintiffs Locke, Nieves, Gonzalez, and Webber v. Griffin)

81.     Plaintiffs incorporate by reference all preceding allegations in this Complaint.

82.     Plaintiffs opposed an unlawful employment practice under the CFEPA — namely, the creation of a hostile work environment on the basis of race.

83.     Plaintiffs' opposition to discrimination was a motivating factor in Griffin's decision to subject and/or continue to subject Plaintiffs to a hostile work environment or otherwise to disadvantage Plaintiffs.

84.     Plaintiffs' conduct in this regard was willful and/or in reckless disregard to Plaintiffs' right to be free from discrimination.

85.     As a result of Griffin's conduct, Plaintiffs suffered damages.

## COUNT FIVE:
### VIOLATION OF 42 U.S.C. § 1981
### (All Plaintiffs v. Griffin)

86.     Plaintiffs incorporate by reference all preceding allegations in this Complaint.

87.     By its actions and omissions, Griffin allowed Plaintiffs to endure a hostile work environment on the basis of their race, and said environment interfered with one or more contracts.

88.     By its actions and omissions, Griffin subjected Plaintiffs to retaliation on the basis of their race, and said retaliation interfered with one or more contracts.

89.     Griffin's conduct in this regard was willful and/or in reckless disregard to Plaintiffs' right to contract free from discrimination.

90.     As a result of Griffin's conduct, Plaintiffs suffered damages.

## COUNT SIX:
### VIOLATION OF 42 U.S.C. § 1981
### (All Plaintiffs v. RC Andersen)

91.     Plaintiffs incorporate by reference all preceding allegations in this Complaint.

92.     By its actions and omissions RC Andsersen allowed Plaintiffs to endure a hostile work environment on the basis of their race, and said environment interfered with one or more contracts.

93.     RC Andersen's conduct in this regard was willful and/or in reckless disregard to Plaintiffs' right to contract free from discrimination.

94.     As a result of RC Andersen's conduct, Plaintiffs suffered damages.

### COUNT SEVEN:
**VIOLATION OF 42 U.S.C. § 1981**
**(All Plaintiffs v. Amazon)**

95.     Plaintiffs incorporate by reference all preceding allegations in this Complaint.

96.     By its actions and omissions Amazon allowed Plaintiffs to endure a hostile work environment on the basis of their race, and said environment interfered with one or more contracts.

97.     Amazon's conduct in this regard was willful and/or in reckless disregard to Plaintiffs' right to contract free from discrimination.

98.     As a result of Amazon's conduct, Plaintiffs suffered damages.

\* \* \*

**WHEREFORE,** Plaintiffs request that this Court assume jurisdiction over this Complaint, enter judgment in their favor, and award them:

1.  Economic damages;

2.  Compensatory damages;

3.  Punitive damages;

4.  Interest, pursuant to § 37-3a of the Connecticut General Statutes;

5.  Reasonable attorney's fees and costs; and

6.  Such other relief as may be just and equitable.

**RESPECTFULLY SUBMITTED,**
**THE PLAINTIFFS**

By:   /s/ *Stephen J. Fitzgerald*

Stephen J. Fitzgerald *(ct22939)*
Joshua R. Goodbaum *(ct28834)*
Betsy A. Ingraham *(ct27820)*
**GARRISON, LEVIN-EPSTEIN**
        **FITZGERALD & PIRROTTI, P.C.**
405 Orange Street
New Haven, CT  06511
Tel.: (203) 777-4425
Fax: (203) 776-3965
sfitzgerald@garrisonlaw.com
jgoodbaum@garrisonlaw.com
bingraham@garrisonlaw.com

THEIR COUNSEL

19