```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT
```

DORNNEL LOCKE, et al.,                :
                                      :
                                      :
    Plaintiffs,                       :
                                      :
v.                                    :    Case No. 3:23-cv-1237 (RNC)
                                      :
WAYNE J. GRIFFIN ELECTRIC,            :
INC., et al.,                         :
                                      :
    Defendants.                       :

## RULING AND ORDER

This case presents an issue of first impression concerning the scope of protection against employment discrimination provided by 42 U.S.C. § 1981, which prohibits race discrimination that "impair[s]" a person's "enjoyment of all benefits, privileges, terms, and conditions of [a] contractual relationship."  The issue is whether employees of a subcontractor at a multi-employer construction site have a cognizable claim under the statute against the general contractor or property owner for failure to prevent repeated acts of race-based harassment by unidentified third parties. Resolution of this issue depends on whether the defendants' alleged control over the plaintiffs' workspace renders them subject to liability under a deliberate indifference standard. I conclude that the allegations are sufficient to support a deliberate indifference claim against the general contractor but not the property owner.

I.

The plaintiffs, employees of defendant Wayne J. Griffin Electric ("Griffin"), allege that they were subjected to a racially hostile work environment while working for Griffin at a

1

construction site in Windsor, Connecticut, managed by defendant RC Andersen, LLC, ("Andersen") and owned by defendant Amazon.com, Inc. ("Amazon"). Over a four-week span, a total of eight hangman nooses were hung in places where the plaintiffs were or would soon be working. Investigations by Windsor police and the FBI failed to identify the perpetrators and they remain unknown. The amended complaint sets forth claims against Griffin, Andersen, and Amazon under section 1981 alleging that they controlled the site and by their omissions allowed a racially hostile work environment to fester.

Andersen and Amazon have each moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the section 1981 claims against them for failure to state a claim on which relief may be granted. They contend that because section 1981 applies only to intentional interference with contract rights motivated by racial animus, their mere failure to stop the harassment is insufficient to expose them to liability under the statute. In response, the plaintiffs do not contend that the defendants should be treated like employers under Title VII, who are liable for workplace harassment of employees by non-employees under a negligence standard. They urge instead that the defendants should be held accountable for deliberate indifference, the standard governing liability in hostile environment actions under civil rights statutes governing education and housing. In such cases, deliberate indifference to discrimination can be shown by a defendant's inaction. Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 141 (2d Cir. 1999) (citing Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 643 (1999)). Liability can be found "when the defendant's response to known discrimination [was] 'clearly unreasonable in light of the known circumstances.'" Id. (quoting Davis, 526 U.S. at 648).

II.

The amended complaint contains the following allegations.

On April 27, 2021, plaintiff Elvin Gonzalez, an electrician working for Griffin at an Amazon distribution center under construction in Windsor, returned to his work area after a lunch break, saw a noose hanging from the ceiling, took a photograph of the noose, and reported it to Griffin management. He also reported it to the other four plaintiffs, all of whom were electricians employed by Griffin to work at the Windsor location.[1]

Griffin foreman Jason Lathrop went to Gonzalez's work area. He was accompanied by Andersen's "safety team." The "safety team" took a report concerning the noose and called the Windsor police department.

The next day, April 28, Griffin management met with the electricians at the Windsor site. During the meeting, Griffin foreman Tom Maribito read a prepared statement from Andersen. Griffin's project manager, Kevin Riendeau, and human resources director, Donna David, also addressed the electricians.

David returned to the jobsite the following day, April 29, to meet with the electricians. She read a letter from Griffin's owner and stated that Andersen would be hiring police monitors and offering a reward for information about the nooses.

After meeting with David, the plaintiffs and other Griffin electricians entered the building to start work for the day and discovered five more nooses in areas where they were assigned to work. The nooses were hung on different floors of the building in locations where only ironworkers had been working. The ironworkers were employed by a subcontractor based in the South

---

[1] The plaintiffs later discovered that a cement foreman had found a noose at the construction site three days earlier and reported it to Andersen.

and some of them wore clothing with confederate insignia. After seeing the nooses, the plaintiffs decided to "badge out" and go home for the day. Windsor police toured the site and eventually found a sixth noose.

Several weeks later, on May 19, another noose was found. The next day, the jobsite was closed to all construction trades except Griffin electricians, who were assigned to hang security cameras. The cameras were pointed at doorways and walls rather than inside the building where nooses might be hung and they were not turned on.[2] One week later, on May 26, another noose was discovered in the building, bringing the total to eight.

At no time during the month-long span did Andersen meet with workers from other trades to talk about the nooses. Those workers, whom the plaintiffs describe as "mostly white," continued to work while Andersen met with Griffin's electricians. By not meeting with workers from other trades, Andersen conveyed the message that the nooses were of concern to the plaintiffs but not others.

In May, the FBI began investigating the hanging of nooses at the Windsor location. After meeting with Griffin and Andersen management, the FBI interviewed several of the plaintiffs. During the meetings, an FBI agent suggested that the plaintiffs hung the nooses themselves in an attempt to get reassigned to higher-paying jobs. The FBI made the plaintiffs submit to polygraph tests and obtained a cell phone belonging to one of the plaintiff's, which contained no incriminating information.[3] For the plaintiffs to be treated like suspects

---

[2] The amended complaint provides no information as to why the Griffin electricians did not activate the cameras after installing them that day. Even so, I accept as true the allegation that the cameras were not activated at that time.
[3] The FBI applied for a warrant for another plaintiff's cellphone, but a Connecticut Superior Court judge denied the application.

added insult to the injury caused by the racially hostile work environment. And they continue to live in fear of the FBI because the investigation remains open.

### III.

The purpose of a Rule 12(b)(6) motion to dismiss is to test whether the complaint adequately alleges the elements of a claim on which some form of relief may be granted by the court. In determining whether a Rule 12(b)(6) motion should be granted, the only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff's favor. Doe v. Columbia Univ., 831 F. 3d 46, 48 (2d Cir. 2016). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible if it is supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

### IV.

"To establish a claim under 42 U.S.C. § 1981, plaintiffs must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." Brown v. City of Oneonta, N.Y., 221 F. 3d 329, 339 (2d Cir. 2000); Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993). The second element, the only one disputed here, requires facts showing that the defendant "intended the discrimination to occur." Gant, 195 F.3d at 141; see also Burgis v. N.Y.C. Dep't of Sanitation, 798 F.3d 63, 68 (2d Cir. 2015) ("To state a discrimination claim under . . . §

1981, plaintiffs must sufficiently allege that defendants acted with discriminatory intent."); Sherman v. Town of Chester, 752 F.3d 554, 567 (2d Cir. 2014) ("For both [§§ 1981 and 1982] claims, [a plaintiff] must allege facts supporting [a defendant's] intent to discriminate against him on the basis of his race.").

Section 1981 claims are frequently brought in tandem with disparate treatment claims under Title VII, which prohibits discrimination in employment "because of" race.  When a claim relies on circumstantial evidence of discriminatory intent, the claim is analyzed using the McDonnell Douglas burden-shifting framework.  Littlejohn v. City of New York, 795 F.3d 297, 312 (2d Cir. 2015) (observing that a plaintiff's "disparate treatment claim under Title VII, § 1981, and § 1983 is subject to the burden-shifting evidentiary framework set forth in McDonnell Douglas").  For a claim to survive a motion to dismiss, the plaintiff must plausibly allege that he is a member of a protected class, and suffered an adverse action, in circumstances permitting a reasonable inference the action was motivated by discriminatory intent.  See id. at 312-13; Banks v. Gen. Motors, LLC, 81 F.4th 242, 269 (2d Cir. 2023).  The McDonnell Douglas framework was developed for use in cases involving discrete instances of adverse action against an employee that are not necessarily prohibited (e.g., firing an at-will employee) but are unlawful if motivated by an employee's protected characteristic.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  In such a case, the employer is obliged to provide a legitimate nondiscriminatory reason for the adverse action.  Id. at 803.  If the reason is pretextual, it may be reasonable to infer that the action was motivated by discriminatory intent.  Id. at 805.

Section 1981 claims have also been brought in tandem with Title VII claims alleging a hostile work environment. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000) ("Section 1981 provides a cause of action for race-based employment discrimination based on a hostile work environment."); Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir.1987) ("The cause of action for a hostile working environment has also been recognized under § 1981."). A claim for a racially hostile work environment is actionable under Title VII or § 1981 if the plaintiff can show that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-67 (1986)); Littlejohn, 795 F.3d at 320-21. "In a claim of a hostile work environment, the emphasis is on the hostility of the work environment as a whole, not the motivation of one decisionmaker, and liability is 'determined only by looking at all the circumstances.'" Rasmy v. Marriott Int'l, Inc., 952 F.3d 379, 389 (2d Cir. 2020) (quoting Harris, 510 U.S. at 23).

The legal sufficiency of a hostile environment claim is determined using an analysis that differs somewhat from the McDonnell Douglas three-step burden-shifting appproach used in disparate treatment cases arising from discrete acts of alleged discrimination. Unlike those cases, where the challenged action could be lawful if not motivated by discriminatory intent, the challenged action in a hostile environment case takes the form of severe or pervasive harassment based on a protected characteristic, which is itself always prohibited. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S, 101, 117

7

(2002)("the entire hostile work environment encompasses a single unlawful employment practice"); Banks, 81 F.4th at 259.  In a hostile environment case, therefore, the employer is not required to proffer a legitimate explanation for the adverse action that can be tested for pretext.  Instead, the analysis asks whether liability for the unlawful harassment can be imputed to the employer.  See Whidbee, 223 F.3d at 69, 72; Williams v. New York City Hous. Auth., 61 F.4th 55, 68-69 (2d Cir. 2023).[4]

In cases under Title VII involving employee-on-employee harassment, liability may be imputed to the employer if its own negligence causes the harassment.  Vance v. Ball State Univ., 570 U.S. 421, 427 (2013).  In cases involving harassment of an employee by a non-employee, an employer may be liable if it "exercises a high degree of control over the behavior of the non-employee" and its "own negligence permits or facilitates

---

[4] The Second Circuit has not instructed district courts to use the McDonnell Douglas framework in hostile environment cases and some courts have decided that the framework does not apply.  See Ferrando-Dehtiar v. Anesthesia Grp. Of Albany, P.C., 727 F.Supp.3d 165, 187 (N.D.N.Y. 2024)("Finally, unlike failure to promote claims, hostile work environment claims are not analyzed using the McDonnell Douglas three-part burden-shifting test."); Matthews v. Corning, Inc., 77 F.Supp.3d 275, 292 (W.D.N.Y. 20145)("[H]ostile work environment claims are not anlayzed using the McDonnell Douglas three-part burden-shifting test").  Without clear guidance from the Second Circuit, I assume that using the McDonnell Douglas framework in a hostile environment case is permissible but not required.  I do not apply the usual three-step burden-shifting framework here because neither side does so and it is unclear how it should be applied.  There are at least two possible approaches.  For the plaintiffs to satisfy their burden at step two of showing that they were subjected to adverse action, they could be required to allege facts showing the existence of a hostile environment and the defendant's failure to act, leaving for analysis at step three whether the circumstances permit an inference that the defendant's inaction was motivated by discriminatory intent.  Alternatively, the hostile environment itself may be considered the adverse action at step two.  Under this approach, the defendant would have to provide a nondiscriminatory explanation for its inaction, which could be tested for prextext at step three.  In this case, I do not follow either of these possible approaches but instead simply consider whether there is a sufficient basis for imputing liability for the hostile environment to the defendant.

8

that non-employee's discrimination." <u>Menaker v. Hofstra Univ.</u>, 935 F.3d 20, 39 (2d Cir. 2019) (internal quotation marks omitted).

This case requires a determination of whether and when liability for workplace harassment can be imputed to a non-employer under section 1981. The statute's text, prohibiting intentional, race-based interference with a person's enjoyment of rights and benefits under a contract, plainly applies to purposeful racial discrimination that interferes with a person's employment. The defendants contend that the statute goes no further and since the amended complaint does not allege that they engaged in purposeful discrimination, the claims must be dismissed. The plaintiffs contend that the defendants may be liable, even if they opposed the hanging of nooses, because they controlled the workplace, knew about the nooses, and failed to take minimally necessary action in circumstances permitting an inference that they intended harassment to occur. The sufficiency of the allegations against each defendant is analyzed below starting with Andersen.

A.

In count six, the plaintiffs contend that Andersen "allowed [them] to endure a hostile work environment on the basis of their race, and said environment interfered with [their] employment contracts with Griffin" in violation of section 1981. ECF No. 45, at ¶ 92. Andersen moves to dismiss this claim on the ground that there is no basis to impute liability to Andersen for the hostile work environment created by the anonymous nooses. Andersen further argues that a deliberate indifference standard does not apply because it is "a standard for municipal liability, not private entity liability." <u>Id.</u> at 7.

No case has been cited or found that addresses the sufficiency of allegations of a section 1981 hostile work environment claim brought by employees of a subcontractor against the general contractor at a multi-employer jobsite. However, the Second Circuit has indicated that section 1981 will provide a cause of action for a hostile environment under the deliberate indifference standard if the defendant had control over the harasser and the context of the harassment comparable to that ordinarily possessed by a school official or an employer. See Francis v. Kings Park Manor, Inc., 992 F.3d 67, 75, 80 (2d Cir. 2021) (en banc) ("Francis II").

In Francis, a tenant claimed that the defendants, who had authority to "counsel, discipline, or evict" other tenants, discriminated against him in violation of the Fair Housing Act ("FHA") and section 1981 by "tolerating and/or facilitating a hostile environment" created by another tenant's repeated acts of race-based harassment. Francis v. Kings Park Manor, Inc., 944 F.3d 370, 379 (2d Cir. 2019) ("Francis I"), opinion vacated on reh'g en banc, 992 F.3d 67 (2d Cir. 2021). The action was dismissed by the District Court under Rule 12(b)(6) because the plaintiff failed to allege that the defendants acted with racial animus rather than deliberate indifference. Id. at 380.

On initial review, a Second Circuit panel found it unnecessary to decide whether deliberate indifference would support a claim under the FHA or section 1981 because the complaint adequately and plausibly alleged that the defendants intentionally discriminated against the plaintiff on the basis of race. Id. The complaint alleged both that the defendants were actually aware of the tenant's criminal harassment of the plaintiff and that they intentionally refused to address the harassment because it was based on race, even though they had

10

addressed non-race-related issues in the past, including, it was fair to infer, tenant-on-tenant harassment. Id.

In support of its holding, the panel cited a Seventh Circuit case under the FHA involving a hostile housing environment. See Wetzel v. Glen St. Andrew Living Cmty., LLC, 901 F.3d 856, 866-67 (7th Cir. 2018). In Wetzel, the court construed the text of the FHA to encompass liability for deliberate indifference in light of the Supreme Court's analysis of the sufficiency of hostile environment claims under Title IX, which similarly prohibits discrimination in educational programs "because of" a protected characteristic. As in hostile work environment cases under Title VII, the analysis under Title IX separately considers (1) whether the plaintiff's allegations sufficiently allege the existence of a hostile environment prohibited by the statute and (2) whether there is a basis for imputing liability to the defendant. Id. at 864. Applying this analysis, the Seventh Circuit concluded that the allegations were sufficient to state a claim against the landlord for subjecting the plaintiff to conduct that the FHA forbids.

In Francis, an en banc panel of the Second Circuit disagreed with the original panel's conclusion that the allegations were sufficient to state a claim under the FHA. Francis II, 992 F.3d at 82. Using the McDonnell Douglas framework, the en banc Court concluded that the complaint did not allege facts making it plausible that the defendants' alleged failure to respond to the harassment was motivated by discriminatory intent. Id. at 73-74.[5] The complaint "alleg[ed] only that [the defendants] intervened, with unspecified

---

[5]  The Court found it unnecessary to address whether the defendants' alleged failure to act constituted adverse action within the meaning of McDonnell Douglas. 9912 F.3d n.21.

11

frequency and forcefulness, to address other unspecified violations of leases or of the law." Id. at 79 n.45.

The en banc Court assumed, for purposes of the appeal, that the deliberate indifference standard adopted in Wetzel can support a hostile environment claim when the allegations permit a reasonable conclusion that "the defendant exercised substantial control over the context in which the harassment occur[ed] and over the harasser." Id. at 75 (citing Davis, 526 U.S. at 646). However, landlords typically lack legal authority and practical means to monitor and prevent tenant misconduct and, unlike the plaintiff in Wetzel, the plaintiff did not plausibly allege that the defendant-landlord "had unusual supervisory control over both the premises and the harassing tenants." Id. at 77.[6] The Court indicated that the complaint in Francis would be sufficient if it alleged that the defendant's "inaction occurred against a backdrop of consistently exercised control over tenants in roughly comparable circumstances" because then "it might be reasonable to infer that the [defendants] intended [the] race-based harassment . . . to occur." Id. at 79 n.45. The Court went on to say that even if the deliberate indifference standard did apply, the defendants' response to the plaintiff's complaints of harassment was not clearly unreasonable as required to support a cognizable claim. Id. at 78-79.

The plaintiff in Francis argued that since employers are responsible for employee-on-employee harassment under Title VII, landlords must be responsible for tenant-on-tenant harassment under similarly worded provisions of the FHA. The argument was unavailing, the Court stated, because "the employer-employee

---

[6] Moreover, "the landlord in Wetzel . . . was alleged to have affirmatively acted against the plaintiff." Id. at 78.

relationship differs from the landlord-tenant relationship in important ways." Id. at 76. Employees are agents of their employer and "a landlord's control over tenants and their workplaces is typically far less than an employer's control over . . . employees and their workspaces." Id. Of particular relevance to this case, the Court added that "the workplace is generally characterized by '[p]roximity and regular contact' among employers, supervisors, and employees." Francis II, 992 F.3d at 76 n.33 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 760 (1998)). "Most employers have ready access to, effective control over, and the ability to move within, the physical workplace and can freely dismiss at-will employees. Employers typically can, and generally do, 'monitor employees' as well as use a wide range of tools to adequately 'investigate . . . misconduct' (including mandatory interviews and other means of gathering information) and 'remediate . . . misconduct' (including suspension, compensation reduction, demotion, transfer, training, and dismissal), all of which gives employers extensive and reliable control over employee behavior." Id. (quoting Francis I, 944 F.3d at 392-93 (Livingston, J., dissenting)).

    Following the guidance provided by the en banc opinion in Francis II, the pivotal issue here is whether the amended complaint supports a plausible inference that Andersen had substantial control over the premises where the nooses were hung and over the persons who hung them such that application of the deliberate indifference standard is warranted. If the deliberate indifference standard applies, and Andersen's response to the nooses was clearly unreasonable in the circumstances, liability may be imputed to Andersen on the ground that it subjected the plaintiffs to conduct Section 1981 forbids.

13

Andersen's rights and obligations as the general contractor on the Windsor project are spelled out in a contract between Andersen; the developer, Scannell Development Company; and another Amazon entity, Amazon.com Services, LLC.[7]  The provisions of the contract, which is in the record, place responsibility on Andersen for workplace safety.  See ECF No. 60, Ex. A § 8.4.  These provisions correspond with requirements under state and federal law governing general contractors on construction sites.  See 29 C.F.R. § 1926.20 ("[N]o contractor or subcontractor for any part of the contract work shall require any laborer or mechanic employed in the performance of the contract to work in surroundings or under working conditions which are unsanitary, hazardous, or dangerous to his health or safety."); U.S. Dep't of Labor, Conn. State Plan, https://www.osha.gov/stateplans/ct (last visited Dec. 18, 2025) (stating that the Occupational Safety and Health Administration ("OSHA") "exercises authority over private sector employers in [Connecticut] and federal OSHA standards apply to these workers"); Conn. Gen. Stat. § 31-367(d).  Under its contract and these regulations, Andersen shared Griffin's responsibility to provide the plaintiffs with a safe place to work.

Given Andersen's responsibility for safety, and viewing the allegations of the complaint in a manner most favorable to the plaintiffs, it is plausible to infer that it had substantial control over the places where the nooses were hung and the persons who hung them.  As general contractor, it controlled access to the worksite and the building.  It had a right to move throughout the building in order to interact with and monitor the subcontractors.  To effectively discharge its responsibility

---

[7] Andersen's contract to manage the project is referenced in the amended complaint and thus properly considered.  See ECF No. 45, at ¶ 28–29.

14

for safety, Andersen could investigate and remediate misconduct by the subcontractors' employees.  Though the identity of the persons who hung the nooses in the building remains unknown, the nooses almost certainly were hung by people authorized to work in the building rather than by trespassers.  The first noose was hung in Gonzalez's work area while he was elsewhere on a lunch break, making it reasonable to infer that it was put there by someone employed by a subcontractor operating under Andersen's oversight.  The five nooses found in the plaintiffs' work areas two days later were located on floors of the building where only the ironworkers had been working.  It is plausible to infer that the nooses were hung during working hours.  Like every other subcontractor, the employer of the ironworkers was answerable to Andersen.[8]

That Andersen's responsibility for safety required it to respond to the nooses is demonstrated by the chronology of events alleged in the amended complaint.  In response to Gonzalez's initial report to Griffin that a noose had been hung in his workplace, Griffin turned to Andersen.  Andersen's safety team accompanied Griffin management to Gonzalez's work area.  After taking a report from him, the safety team called Windsor police.  Andersen then provided Griffin with a statement to be read to the plaintiffs and apparently authorized Griffin to say

---

[8] Andersen's lack of more information concerning the identity of the persons who hung the nooses is relevant to its liability but not dispositive. See, e.g., Eisenberg v. New York City Dep't of Educ., No. 24-cv-01661 (HG), 2025 WL 2022093, at *8 (E.D.N.Y. July 18, 2025(stating as part of a clearly unreasonable analysis that, because "the sexual harassment was anonymous, there was little the [defendant] could do"); Russell v. New York Univ., No. 1:15-cv-02185 (GHW), 2017 WL 3049534, at *29 (S.D.N.Y. July 17, 2017) (concluding that the defendant university took reasonable steps within its control to remedy the hostile work environment where the complained of behavior was anonymous), aff'd, 739 F. App'x 28 (2d Cir. 2018); see also Tademy v. Union Pac. Corp., 614 F.3d 1132, 1149 (10th Cir. 2008) (concluding that "difficulties with investigating anonymous acts of harassment" "present factual questions about the reasonableness of [the employer's] response").

that it would be hiring police to monitor the building and would also be offering a reward for information about the nooses.

Viewed in a manner most favorable to the plaintiffs, these facts and circumstances permit a plausible inference that Andersen's control over the premises and the harassers was sufficiently substantial to provide a basis for liability to the plaintiffs under section 1981. The degree of control that may fairly be inferred is less than that possessed by an employer with regard to harassment of employees at a single-employer worksite, or by school officials with regard to harassment occurring on school grounds during the school day. But it is closer to that degree of control than the degree of control typically possessed by a landlord with regard to tenant-on-tenant harassment. Application of the deliberate indifference standard is therefore warranted.

Under this standard, Andersen is subject to liability if its response to the nooses was "clearly unreasonable in light of the known circumstances." Francis, 992 F.3d at 78 (citing Davis, 526 U.S. at 648). This standard permits liability to be imposed on Andersen although it undoubtedly would have much preferred that no more nooses be hung in the building. The plaintiffs contend that their allegations are sufficient to support a finding of deliberate indifference on the part of Andersen. I agree.

The amended complaint alleges that Andersen failed to "conduct an investigation, interview potential perpetrators, warn sub-contractors, install surveillance devices, issue announcements/warnings, [and] increase security[.]" ECF No. 45, at ¶ 50, 55. These allegations permit a plausible inference that apart from calling the Windsor police, Andersen took no action in the wake of the hanging of the noose in Gonzalez's

16

workspace.[9] In addition to calling the police, Andersen could have promptly followed through on its commitment to hire police monitors but it apparently failed to do so. As a result of Andersen's failure to do more at the time, it can be fairly inferred, five more nooses soon appeared in the plaintiffs' work areas. After those nooses were reported to Andersen, it apparently failed to investigate the potential involvement of the ironworkers although they were the only people who had been working there. By failing to conduct any investigation of the ironworkers, Andersen can be deemed to have encouraged the hanging of yet more nooses in the plaintiffs' work areas. Another noose appeared, unsurprisingly in the circumstances, on May 19, after which the building was closed for a day to everyone except Griffin electricians. There is no indication that Andersen took any additional action to prevent hanging of more nooses after the building reopened to other trades.[10] The final noose turned up a week later. Given the totality of these circumstances, Andersen's response to the nooses may be considered clearly unreasonable.

The claim against Andersen therefore survives the motion to dismiss.

B.

Count seven of the amended complaint attempts to assert a section 1981 claim against Amazon on the theory that it too controlled the plaintiffs' work environment making it subject to liability for deliberate indifference. Like Andersen, Amazon

---

[9] Calling the police was not necessarily sufficient to remedy the harassment. See Riggins v. Town of Berlin, No. 23-868-CV, 2024 WL 2972896, at *3 (2d Cir. June 13, 2024) (concluding that bringing the plaintiff's complaints to the police was not sufficient); see also Cox v. Onondaga Cnty. Sheriff's Dep't, 760 F.3d 139, 149 (2d Cir. 2014) ("[T]he primary purpose of Title VII is not to provide redress but to avoid harm.").

[10] As noted earlier, plaintiffs allege that the newly installed cameras were never turned on.

submits that section 1981's prohibition of intentional discrimination does not permit liability for mere failure to ensure that the plaintiffs enjoyed equivalent employment opportunities.  ECF No. 59, at 13 (citing Gen. Bldg. Contractors Ass'n, 458 U.S. at 396-97).  In addition, it submits that the deliberate indifference standard does not apply to non-employers and in any event the allegations concerning its purported control are merely conclusory.  I agree that the allegations do not permit a reasonable inference that Amazon had substantial control over the persons who hung the nooses and the circumstances in which they did so.  I also agree that there is no other basis for imputing liability to Amazon.[11]

Plaintiffs' only well-pleaded factual allegations regarding Amazon are that it owned the property, had a "presence on the site," and closed the site to other subcontractors for a day while Griffin contractors hung security cameras.  Taken together, and viewed most favorably to the plaintiffs, these allegations are insufficient.[12]

Under Connecticut law, an owner of property under construction has a limited duty to employees of subcontractors, who are considered business invitees.  See Morin v. Bell Ct. Condo. Ass'n, Inc., 223 Conn. 323, 327 (1992) ("A possessor of

---

[11]  The plaintiffs allege in the amended complaint that, upon information and belief, Amazon "hired RC Andersen as its agent to manage construction projects."  ECF No. 45, at ¶ 29.  However, they do not allege any facts to support this assertion.  Without any factual allegations, the plaintiffs have not plausibly pleaded an agency relationship nor an agency theory of liability.  Iqbal, 556 U.S. at 678 (stating that "naked assertion[s] devoid of further factual enhancement" are not sufficient) (internal quotation marks omitted).

[12]  The plaintiffs also allege that Griffin electricians found a noose hanging in their workspace at a construction site owned by Amazon in Bloomfield, Connecticut, in 2017.  However, Amazon's knowledge of the 2017 noose in Bloomfield has little or no relevance to the issue whether it had substantial control over the persons who hung the nooses in Windsor, or the circumstances in which they did so.

18

land has a duty to an invitee to reasonably inspect and maintain the premises in order to render them reasonably safe. . . . In addition, the possessor of land must warn an invitee of dangers that the invitee could not reasonably be expected to discover."); 2 Premises Liability 3d § 39:7 (2025 ed.) ("[A]n employee of a subcontractor is an invitee as to . . . the owner . . of the premises."). This duty does not extend to protecting them against acts of misconduct by third parties with whom the owner has no relationship. No facts are pleaded showing that Amazon assumed a greater duty here. Rather, Amazon has shown that it is several steps removed from the contract between Griffin and Andersen.

Amazon's presence on the site allegedly consisted of a "centralized technology hub." There is no apparent nexus between the technology hub and Amazon's control over the plaintiff's work areas or the activities of people working in these areas. Amazon's limited presence at the technology hub could help support an inference that its employees learned about each noose soon after it appeared. But such knowledge does not provide a basis for imputing liability for the harassment to Amazon.

With regard to the closing of the site while security cameras were hung, the amended complaint does not specifically allege that Amazon, rather than Andersen, ordered the closing and it is implausible that Amazon unilaterally issued such an order since it was not directly involved in the project. Even assuming Amazon in its capacity as property owner retained a right to close the property and exercised this right to effectively suspend construction activity in the building, it does not follow that it had substantial control over the persons

who hung the nooses or the circumstances in which the nooses were hung.

V.

Accordingly, Andersen's motion to dismiss count six of the amended complaint is denied and Amazon's motion to dismiss count seven is granted.

So ordered this 22nd day of December 2025.

                                                                              /s/ RNC
                                                    Robert N. Chatigny
                                            United States District Judge